H. C. Thorman v. Commissioner. Nina L. Thorman v. Commissioner.
H. Thorman v. Commissioner
Docket Nos. 15674, 15675.
United States Tax Court
1949 Tax Ct. Memo LEXIS 127; 8 T.C.M. (CCH) 653; T.C.M. (RIA) 49176; July 7, 1949
*127 Leon O. Lewis, Jr., Esq., Transit Tower, San Antonio, Tex., for the petitioners. John P. Higgins, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined deficiencies of $3,057.94 and $3,408.86 in petitioners' respective income and victory taxes for 1943. Petitioner in Docket No. 15674 contests the disallowance of a deduction claimed because of the alleged worthlessness of a debt settled by compromise in that year. Respondent contends that the debt became worthless prior to 1943; that the amount of it is not established, and in the alternative that it was of a non-business character and only half is deductible under section 23(k)(4), Internal Revenue Code. Both petitioners assigned error in the addition to their community income of certain gains from the sale of rented houses, but abandoned this issue at the hearing. Findings of Fact H. C. Thorman, petitioner in Docket No. 15674, a resident of San Antonio, Texas, filed a separate income and victory tax return for 1943 with the collector of internal revenue for the first district of Texas. His wife, Nina L. Thorman, petitioner *128 in Docket No. 15675, to whom he was married in 1936, filed a separate return for the same year with the same collector. H. C. Thorman (hereafter called petitioner) has been engaged in the business of building homes and selling real estate in San Antonio since prior to 1929. Between May 1 and June 11, 1929, petitioner made seven cash advances, aggregating $44,311.60, to or on behalf of R. T. McDermott, which advances were charged to McDermott's account on petitioner's books. They were not evidenced by notes when made, but on June 11, 1929, McDermott gave to petitioner an 8 per cent demand note for $25,000 and an 8 per cent demand note for $4,000. On the same date a certificate for 175 shares of stock in the Corpus Christi Cadillac Co. was issued to petitioner, and petitioner gave to McDermott his check for $2,135.19, which check was charged to McDermott's account with him. There was no credit to the account, however, for the notes and shares which petitioner received. Pursuant to an understanding reached in October petitioner transferred the shares to McDermott on January 2, 1930, for a price of $17,500 which was never paid. This was the same price at which petitioner had taken them. *129 The two notes have never been paid, but were returned to McDermott in 1943. After June 11, 1929, petitioner continued to make advances to McDermott, sometimes by cash payment, sometimes by check and sometimes by honoring McDermott's drafts drawn against him. Between June 11, 1929, and September 15, 1930, he had made eleven such advances, varying in amount from $947.22 to $5,016.67, and McDermott had made two repayments on account in October and one in December, 1929, the three aggregating $9,950. The advances were charged and the repayments were credited to the account, and on September 15, 1930, it showed a debit balance of $69,517.14. McDermott was developing automobile sales agencies, but business conditions were becoming unfavorable, and he made no payments after 1929. Petitioner repeatedly called on him to do so and received assurances that repayment would be made, but could get no note or other evidence of the indebtedness. In 1932 petitioner discussed the account with a banker and a lawyer, both of whom were of opinion that the statute of limitations prevented recovery by suit and that nothing could be collected. McDermott in the meanwhile had moved from San Antonio to Houston *130 and on January 7, 1933, petitioner wrote him a letter, "giving" specified credits on the account and enclosing for his signature a 6 per cent note for a balance of $54,161.62, payable in weekly installments of $125. On an accompanying statement petitioner computed the advances, together with 6 per cent interest to January 1, 1933, to be $85,980.82. He deducted credits, aggregating $31,819.20 described as relating to transactions of 1929 and 1930. These comprised $17,500 on account of the Corpus Christi Cadillac Co. stock, $2,000 on account of three automobiles, $1,000 described as "Furniture from Scobey", and about $6,000 on account of McDermott's interest in certain real estate. Interest of 6 per cent was added to the credit items. In the letter he stated: "* * * I am giving you credit on the Thorman Place house, credit on Lot in Northcrest, credit on furniture from Scobey's and credit on three cars and I am crediting you with the $17,500.00 worth of stock in the Corpus Christi Cadillac Company and am taking this loss, * * *." McDermott did not reply to this letter, but petitioner persisted in his attempts to collect by other letters, telegrams and telephone calls. Eventually *131 he made six trips to Houston or to New Orleans, where McDermott later moved, to press for payments. These efforts produced results. McDermott paid $500 on August 8, 1935, and $500 on January 16, 1936. On October 1, 1936, 200 shares of United Corporation stock, received from McDermott, were credited on the account at $2,000. McDermott made two $500 payments in 1937; paid $2,000 in three installments in 1938; made one $1,000 payment in 1939, and two in 1940. In 1941 he made eight $1,000 payments; in 1942 he paid $7,000 in three installments, and petitioner charged him with $4,906.88 relating to certain undescribed transactions of 1929. McDermott paid $2,000 more in January 1943 and $5,000 in May 1943. All of these payments were duly entered as credits on the account, which after the payment of May showed a balance due of $42,424.02. Throughout the years McDermott, while not denying liability, steadily evaded petitioner's requests for a note, and never made a payment without being pressed for it. On June 4, 1943, McDermott offered $25,000 in full settlement of the remainder due. Petitioner accepted the offer, deeming it to his best advantage since collection could not be enforced *132 by suit. He received this payment; credited the $25,000 on the account, and wrote off the balance of $17,424.02 as a bad debt. He claimed the amount as a business deduction on his income tax return for 1943 in computing community profits of his real estate business. Petitioner's advances to McDermott were non-business loans, made prior to marriage with his separate funds. Of such loans $17,424.02 was uncollected and written off as a bad debt in 1943. By the compromise settlement petitioner sustained a loss of $17,424.02. The Commissioner disallowed the $17,424.02 claimed as a business bad debt, stating in the deficiency notice that $56,000 had been paid, leaving uncollected only $161.62, which was not shown not to have been forgiven. By virtue of this disallowance community income was increased $17,424.02, and $8,712.01 was added to the income of petitioner and a like amount to the income of his wife. Opinion The statement in the deficiency notice is that McDermott's debt was $56,161.62, of which $56,000 was repaid by June 4, 1943. Petitioner introduced a statement of all charges and credits on the McDermott account, testifying that the amounts charged represented payments by *133 him to or for McDermott, and respondent admitted that they did, but expressly denied their character as loans. Petitioner stated that they were loans, and his statement is amply corroborated by the two notes for $29,000 given on June 11, 1929; McDermott's acknowledgment of liability to repay, and his eventual repayment of the greater part. We have found that they were loans, and respondent does not on brief defend his determination by any contention that they were not, despite his denial at the hearing. But respondent argues that no debt existed in 1943 because articles 5526-7, Vernon's Texas Statutes, provide that suit for collection of a debt on open account is barred after two years and suit for collection of a note is barred after four years. As a period of five years elapsed between the last advance in 1930 and the first repayment in 1935, it seems obvious that petitioner had no legal remedy, and indeed he was so advised by his banker and his lawyer. Because of this respondent contends that the debt became worthless about 1933, and no part of it can be claimed as a deduction in 1943. He cites Duffin v. Lucas, (C.C.A., 6th Cir.) 55 Fed. (2d) 786, certiorari denied, *134 287 U.S. 611, to the effect that a taxpayer must furnish convincing evidence to establish that a debt did not become worthless until a year subsequent to the time that its recovery by suit was barred. We are of opinion that petitioner has furnished convincing evidence. Worthlessness is a question of fact, not of legal presumption, and as the Circuit Court of Appeals for the Second Circuit said in Blair v. Commissioner, 91 Fed. (2d) 992: "* * * If the taxpayer has reasonable expectation that the debt or any part of it may be paid, he is under no duty to charge it off, and the rule is that ordinarily in making this determination he is allowed a fair degree of latitude. * * *" See also Rassieur v. Commissioner, (C.C.A., 8th Cir.) 129 Fed. (2d) 820. Petitioner did not despair of collection after legal recovery was barred, and his hopes were justified, as the event proved. He testified that McDermott readily recognized liability and promised repayment even if no note from him could be procured, and the persistence of petitioner's efforts is of itself evidence of his constant conviction that the debtor would eventually pay something. After 1935 *135 occasional payments justified his efforts and warranted his expectations, and while these payments did not toll the statute of limitations, Art. 5539, Vernon's Texas Statutes; Luck v. Riggs Optical Co., 149 S.W. (2) 204; Krueger v. Krueger, 76 Tex. 178; 12 S.W. 1004; Meusebach v. Half, 77 Tex. 185; 13 S.W. 979, experience showed that McDermott's debt did not become worthless prior to 1943. Indeed the evidence is not conclusive that petitioner could not have collected more than the $25,000 in 1943, and under the circumstances we cannot find that the uncollected portion of the debt was worthless. But we do hold it deductible as a loss sustained in a compromise settlement. Cf. First National Bank of Durant, 6 B.T.A. 545; Pacific Novelty Co., 5 B.T.A. 1017; Russell Wheel Foundry Co., 3 B.T.A. 1168. Respondent's second contention is that payments not credited in McDermott's account had reduced petitioner's unrepaid advances to $54,161.62 by 1933, and if the total repayments thereafter made are credited against this figure, then petitioner collected all but $161.62 of the debt. This *136 contention admittedly rests on petitioner's letter and enclosed statement of January 7, 1933, in which he asked McDermott for a note payable in weekly installments of $125 and said that he was "giving" listed credits, which aggregated $31,819.20. Respondent would treat these credits as acknowledged repayments. Petitioner testified: "What I was attempting to do was to bring this account down, to get Mr. McDermott to sign a note payable to me in that amount * * * rather than try to collect the full debt." Respondent argues that the statement purported to be the rendering of an account and that petitioner's explanation of the credits is contrary to the literal wording of the letter. We cannot agree. Under the circumstances shown petitioner's testimony that he intended the credits as an offer or inducement to procure McDermott's signature on a note is not only plausible but corroborated by other evidence. The credits are described as relating to 1929 and 1930 transactions and have never been entered on the account, although cash payments and a stock delivery have been regularly credited. The item of $17,500 for the Cadillac Co. shares could not be deemed a credit for value since *137 petitioner conveyed those shares to McDermott, and never received the price. A very large part of the 1933 statement, moreover, consisted of interest. But McDermott never paid any interest, and petitioner here computes his deductible loss without reflecting any in the uncollectible part of the loan written off. Respondent attacks the completeness of the account as recorded on the books because of petitioner's admission on cross examination that no entry was ever made in it to reflect the two notes for $25,000 and $4,000 or the $17,500 for stock. Petitioner explained that the requisite entries had been made in the journal and that the transactions of June 11 were "to balance that account out." Whatever deterred petitioner from transferring the entries to the ledger, it seems plain that the proposed balancing never occurred for the notes and stock were conveyed back to McDermott without any payment by him. We perceive no reason to discredit the account because of failure to record a proposed settlement that was never carried out by the parties. Respondent argues in the alternative that if the bad debt is deductible, as claimed by petitioner, it was of a non-business character, and *138 under section 23(k)(4) must be "considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months." By the cited section a "non-business debt" is one not evidenced by a corporate security and not incurred in the taxpayer's trade or business. Clearly it was not evidenced by a corporate security, and as petitioner was engaged in the business of building homes and selling real estate, we cannot find that it was incurred in his business. The parties are agreed that as the loan was made prior to petitioners' marriage in 1936, the deduction is available to the husband only and not against community income. Decisions will be entered under Rule 50.